OPINION
{¶ 1} Defendant-appellant, the Ohio Department of Public Safety, Ohio State Highway Patrol ("OSHP"), appeals from a judgment of the Court of Claims of Ohio in favor of plaintiff-appellee, John D. Robertson. For the following reasons, we affirm.
 {¶ 2} At approximately 2:15 a.m. on January 11, 2001, Lee Sredniawa, an OSHP trooper, was patrolling in Howland Township, Ohio when he observed a speeding *Page 2 
automobile run a red light. Trooper Sredniawa followed the automobile in his police cruiser, and upon catching up with it, he activated the cruiser's lights and siren. In response, the driver of the automobile, later determined to be Colin Roberts, braked and pulled into a parking lot. Trooper Sredniawa stopped behind Roberts' automobile, notified his dispatcher that he was making a traffic stop, and relayed the automobile's plate number.
 {¶ 3} Seconds after Trooper Sredniawa completed this radio transmission, Roberts accelerated and drove back onto the road. Trooper Sredniawa pursued Roberts, keeping pace with him as he sped northbound on State Route 46. After Roberts turned west onto North River Road, his driving became increasingly erratic — he drove left of center numerous times and almost veered into a ditch. Going over 100 miles per hour, Roberts ran a red light located at the intersection of North River Road and North Road. Behind Roberts, Trooper Sredniawa also drove through the red light, but he slowed to check for traffic. Then, realizing that the distance between his cruiser and Roberts' automobile was growing, Trooper Sredniawa accelerated to over 80 miles per hour.
 {¶ 4} Shortly after crossing North Road, Roberts arrived at the Elm Road intersection. Witnesses later testified that Roberts sped through a red light at that intersection at approximately 100 miles per hour. Trooper Sredniawa, however, approached the Elm Road intersection at a lesser speed. Trooper Sredniawa had three reasons to be concerned about pursuing Roberts through the Elm Road intersection. First, upon crossing the North Road intersection, he could see that the light was red at the Elm Road intersection. Trooper Sredniawa understood that a red light for traffic on North River Road meant that a green light would be allowing traffic on Elm Road to proceed. *Page 3 
Second, due to his life-long familiarity with the area, Trooper Sredniawa knew that he would not have a clear view of the Elm Road intersection until he crested a hill situated immediately before the intersection. Finally, Trooper Sredniawa also knew that four 24-hour businesses were located near the intersection and that the speed limit was only 35 miles per hour.
 {¶ 5} When Trooper Sredniawa crested the hill, he saw three automobiles stopped at the Elm Road intersection. A burgundy Saturn was located in the eastbound lane of North River Road, facing Trooper Sredniawa. The other two automobiles were located to Trooper Sredniawa's right in the southbound lanes of Elm Road. At the Elm Road/North River Road intersection, Elm Road consists of three southbound lanes — one left-hand turning lane and two straight lanes. A Bazetta Township police cruiser, driven by Sergeant Nick Papalas, was stopped in the left-hand turning lane. Sergeant Papalas' lights and siren were activated. A black Lincoln, driven by Joseph Robertson, sat in the straight lane immediately adjacent to the left-hand turning lane. Because Sergeant Papalas had pulled his cruiser beyond the stop bar and slightly into the intersection, it shielded the majority of Robertson's automobile from Trooper Sredniawa's view. Trooper Sredniawa could only see the taillights of Robertson's automobile.
 {¶ 6} Trooper Sredniawa did not have radio contact with Sergeant Papalas. He did not know whether Sergeant Papalas had secured the intersection or whether Sergeant Papalas intended to join the pursuit. Nevertheless, given the location of Sergeant Papalas' cruiser in relation to Robertson's automobile, Trooper Sredniawa assumed that Sergeant Papalas had "nosed off" Robertson's automobile. Trooper Sredniawa's assumption was wrong. *Page 4 
 {¶ 7} Erroneously concluding that the intersection was secure, Trooper Sredniawa accelerated. As Trooper Sredniawa entered the intersection against the red light, Robertson drove forward. Trooper Sredniawa's cruiser slammed into the driver's side of Robertson's automobile, killing Robertson and injuring his passenger.
 {¶ 8} Trooper Sredniawa crested the hill before the Elm Road intersection only five seconds before colliding with Robertson's automobile. He accelerated approximately three seconds before the collision — right before he entered the intersection. In those three seconds, Trooper Sredniawa's speed averaged 78 miles per hour. Before braking in a fruitless attempt to avoid Robertson's automobile, Trooper Sredniawa was traveling at 71 miles per hour. Given his speed, Trooper Sredniawa collided with Robertson less than a second after Robertson drove into the intersection. The entire pursuit lasted only two minutes and 27 seconds.
 {¶ 9} On September 17, 2001, appellee, acting individually and as executor of his son's estate, filed wrongful death and survivorship claims against the OSHP. After a trial on the issue of liability, the trial court rendered judgment against the OSHP. In a decision accompanying the judgment, the trial court held that because Trooper Sredniawa engaged in both willful and wanton misconduct, the OSHP was liable for Robertson's death. Subsequent to a damages trial, the trial court ordered the OSHP to pay $1,177,194.86 to Robertson's estate and beneficiaries. The OSHP appealed from this final order.
 {¶ 10} On appeal, the OSHP assigns the following errors:
 [1] A STATE TROOPER HAS NOT ENGAGED IN WILLFUL MISCONDUCT IF HIS ACTIONS DURING AN EMERGENCY PURSUIT WERE AUTHORIZED, PERMITTED AND *Page 5 
DISCRETIONARY AND IF HE ACTED IN GOOD FAITH WITHOUT INTENT OR PURPOSE TO INJURE.
 [2] WHEN A TROOPER HAS USED SOME CARE IN RESPONDING DURING AN EMERGENCY PURSUIT, HE HAS NOT ACTED IN A WANTON MANNER.
 {¶ 11} Appellee assigns a single conditional cross assignment of error:
 If this Court reverses both the trial court's findings of wilful [sic] and wanton misconduct in this case, then Robertson's spoliation of evidence claim must also be reversed and remanded for trial.
 {¶ 12} By its first assignment of error, the OSHP argues that Trooper Sredniawa did not engage in willful misconduct, and that the trial court erred in finding otherwise. Because the trial court used the wrong standard to decide whether Trooper Sredniawa committed willful misconduct, we agree.
 {¶ 13} The OSHP is immune from liability for injuries that a patrol officer causes while operating his vehicle in response to an emergency call unless the officer engages in willful or wanton misconduct.Baum v. Ohio State Highway Patrol, 72 Ohio St.3d 469, 1995-Ohio-155, syllabus. In adopting this rule of law, the Supreme Court of Ohio reasoned that the state should enjoy the same level of immunity that the General Assembly affords to counties, cities, and townships. Id. at 472. Pursuant to R.C. 2744.02(B)(1)(a), counties, cities, and townships are immune from liability when "[a] member of a municipal corporation police department or any other police agency was operating a motor vehicle while responding to an emergency call and the operation of the vehicle did not constitute willful or wanton misconduct."
 {¶ 14} In applying R.C. 2744.02(B)(1)(a), this court has defined "willful misconduct" to mean conduct involving "the intent, purpose, or design to injure." Byrd v. Kirby, *Page 6 
Franklin App. No. 04AP-451, 2005-Ohio-1261, at ¶ 22. We adopted this standard from Gladon v. Greater Cleveland Regional Transit Auth.,75 Ohio St.3d 312, 1996-Ohio-137. The trial court, however, relied upon neither Byrd nor recent Supreme Court precedent in analyzing Trooper Sredniawa's conduct. Instead, it applied an older Supreme Court case that defines willful misconduct as "an intentional deviation from a clear legal duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." Tighe v. Diamond (1948), 149 Ohio St. 520, 527. Importantly, unlike the more modern definition of "willful misconduct," the Tighe definition expressly excludes intent to injure. Id. ("In order that one may be guilty of `wilful [sic] misconduct,' an actual intention to injure need not be shown.").
 {¶ 15} As the Supreme Court never overruled (or even addressed)Tighe in Gladon or in any other case containing the same definition asGladon, the controlling precedent includes two inconsistent definitions of willful misconduct.[1] In such a situation, courts are required to follow the more recent precedent. Miller v. Lindsay-Green, Inc., Franklin App. No. 04AP-848, 2005-Ohio-6366, at ¶ 101 ("[A] prior decision is not determinative of a legal question when a latter case of the same court to the contrary is available."). Accordingly, we find that the trial court applied the wrong standard, and to the extent that the OSHP so argues, we sustain the first assignment of error. *Page 7 
 {¶ 16} By the OSHP's second assignment of error, it argues that the manifest weight of the evidence does not support the trial court's finding that Trooper Sredniawa engaged in wanton misconduct. Because competent, credible evidence underlies that finding, we disagree.
 {¶ 17} In reviewing the trial court's decision that Trooper Sredniawa committed wanton misconduct, we are guided by the principle that judgments supported by some competent, credible evidence will not be reversed as being against the manifest weight of the evidence. C.E.Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus. In examining the evidence, an appellate court must make every reasonable presumption in favor of the trial court's judgment. Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 80. Thus, if the evidence adduced at trial is susceptible to more than one interpretation, an appellate court must give it the interpretation that is consistent with the trial court's judgment. Central Motors Corp. v. Pepper Pike,73 Ohio St.3d 581, 584, 1995-Ohio-289. Disagreement with a trial court's judgment is not a sufficient basis on which to reverse that judgment. State v.Wilson, 113 Ohio St.3d 382, 2007-Ohio-2202, at ¶ 40.
 {¶ 18} Wanton misconduct is the failure to exercise any care toward one to whom a duty of care is owed under circumstances in which there is a great probability that harm will result and the tortfeasor knows of that probability. Hunter v. Columbus (2000), 139 Ohio App.3d 962, 969, citing Matkovich v. Penn Cent. Transp. Co. (1982), 69 Ohio St.2d 210. In the continuum between negligence and intentional misconduct, wanton misconduct is a degree greater than negligence. Brockman v. Bell (1992),78 Ohio App.3d 508, 515. "`[M]ere negligence is not converted into wanton misconduct unless *Page 8 
the evidence establishes a disposition to perversity on the part of the tortfeasor.'" Fabrey v. McDonald Village Police Dept, 70 Ohio St.3d 351,356, 1994-Ohio-368, quoting Roszman v. Sammett (1971), 26 Ohio St.2d 94,96-97.
 {¶ 19} When evaluating whether a police officer has engaged in wanton misconduct, a finder of fact must consider the totality of the circumstances. Hunter, supra, at 971. Simply activating one's lights and siren, looking where one is going, or applying one's brakes "meets the literalistic, but not legal, definition of `any care.'" Id. at 970. In other words, even if a police officer undertakes some slight measure of caution, a finder of fact may still conclude that the officer's actions, when viewed as a whole, exhibit the perversity necessary for wanton misconduct.
 {¶ 20} In the case at bar, the trial court held that Trooper Sredniawa failed to show any care for Robertson when he sped into the Elm Road intersection against a red light. Trooper Sredniawa owed Robertson and all other drivers a duty to "slow down as necessary for safety to traffic" and to "proceed cautiously past [a] red or stop sign or signal with due regard for the safety of all persons using the street or highway." R.C. 4511.03. Michael Cosgrove, one of appellee's expert witnesses, testified that this duty obligated Trooper Sredniawa to slow to a speed at which he could timely respond to any obstruction that appeared in the intersection. Michael Hunter, appellee's other expert witness, concurred with Cosgrove, stating that OSHP policy required Trooper Sredniawa to drive through the red light at a speed where, if necessary, he could stop if another vehicle drove into the intersection. Moreover, Trooper Sredniawa himself recognized that he had a duty to slow down to a speed that would permit him to stop if traffic came into the intersection. *Page 9 
 {¶ 21} The OSHP argues that Trooper Sredniawa showed care in complying with this duty because he slowed and assessed the situation before entering the intersection. The trial court, however, found that based upon the circumstances, driving into the intersection at over 70 miles per hour demonstrated a perversity that rose to the level of wanton misconduct. Competent, credible evidence present in the record supports the trial court's finding.
 {¶ 22} Trooper Sredniawa knew that multiple factors limited Robertson's ability to perceive his cruiser as it approached and entered the intersection. First, until Trooper Sredniawa crested the hill immediately prior to the intersection, he could not see the vehicles at the intersection and the drivers of those vehicles could not see his cruiser. Second, Trooper Sredniawa's speed as he crested the hill and approached the intersection limited the time period Robertson had to see Trooper Sredniawa's cruiser. Based upon the videotape from Trooper Sredniawa's cruiser, Trooper Sredniawa crested the hill only five seconds before colliding with Robertson. Third, Sergeant Papalas had pulled his cruiser forward so that his cruiser at least partially obstructed Robertson's view to the east — the direction from which Trooper Sredniawa entered the intersection. Indeed, Sergeant Papalas' cruiser blocked all but Robertson's taillights from Trooper Sredniawa's view and prevented Trooper Sredniawa and Robertson from making any eye contact.
 {¶ 23} The OSHP points out that Trooper Sredniawa's lights and siren should have given Robertson advance warning of Trooper Sredniawa's approach. However, those early-alert devices had minimal effect because Sergeant Papalas — who was stopped next to Robertson — had also activated his cruiser's lights and siren. As the trial *Page 10 
court found, Sergeant Papalas' lights and siren masked Trooper Sredniawa's lights and siren.
 {¶ 24} In addition to knowing that Robertson might not see his cruiser, Trooper Sredniawa had other reasons to suspect that Robertson might enter the intersection. Trooper Sredniawa knew that a red light for his lane of travel meant that a green arrow would appear for the left-hand turn lane of southbound Elm Road and then a green light would appear for the straight lanes. Thus, Trooper Sredniawa understood that Robertson, sitting in the middle, straight lane, would receive a green light around the time that he would pass through the intersection. Further, as Cosgrove testified, pursuing officers commonly experience vehicles pulling out in front of them as they chase suspects. Although Trooper Sredniawa believed that Sergeant Papalas had "nosed off" Robertson's car, he also acknowledged that his training had taught him never to assume anything in a high-speed pursuit. Trooper Sredniawa admitted that he did not know whether or not Sergeant Papalas had actually secured the intersection.
 {¶ 25} Despite these circumstances, Trooper Sredniawa entered the intersection at over 70 miles per hour. According to Cosgrove, "you cannot go into an intersection at 70 miles an hour plus under these circumstances and indicate that that's any care that's being generated toward the general public and other officers and himself, for that matter, in operating a vehicle in that fashion." (Tr. at 152.) As Cosgrove explained, he believed that Trooper Sredniawa's conduct was wanton because the trooper entered the intersection at such a high rate of speed that he had "merely split seconds * * * to recognize a potential crash situation and apply evasive action." (Tr. at 149.) Further, not *Page 11 
only did Trooper Sredniawa's speed negate his ability to prevent a crash, it also created a situation in which any crash would result in major damage.
 {¶ 26} The OSHP argues that Trooper Sredniawa showed some care because he slowed at least 40 miles per hour (from his earlier speed of 110 miles per hour) before entering the intersection. We find this argument unavailing. The relevant inquiry is whether Trooper Sredniawa's conduct, when considered in its totality, exhibits perverse disregard for the safety of other drivers. The evidence establishes that in this situation, entering the intersection at over 70 miles per hour satisfies that inquiry. The fact that Trooper Sredniawa could have been driving faster only demonstrates that he could have acted even more perversely than he did.
 {¶ 27} Additionally, the OSHP argues that Trooper Sredniawa showed some care because he assessed the intersection before entering it and deemed it safe to proceed. However, Trooper Sredniawa's wanton misconduct does not stem from his decision to enter the intersection, but rather, from his excessive speed as he did so. As Cosgrove testified, Trooper Sredniawa would not have been wanton under these circumstances if he had driven through the intersection at speed that mitigated the risk to others.
 {¶ 28} Finally, the OSHP attacks the evidentiary basis underlying the trial court's finding that Trooper Sredniawa decided to continue the pursuit prior to cresting the hill before the Elm Road intersection. The trial court, however, used that finding to support its conclusion that Trooper Sredniawa engaged in willful misconduct. Therefore, we find it irrelevant to whether Trooper Sredniawa committed wanton misconduct. Further, in determining if the evidence proves wanton misconduct, it is of no consequence whether Trooper Sredniawa decided to continue his pursuit through the intersection before or after *Page 12 
he crested the hill. Instead, as we stated above, the analysis turns upon the speed Trooper Sredniawa decided to use under the circumstances.
 {¶ 29} In sum, appellee adduced competent, credible evidence from which the trial court could find that Trooper Sredniawa, aware of the distinct possibility that Robertson would enter his path, drove into the intersection at a speed that demonstrated an absence of care for Robertson's safety. Therefore, we conclude that the manifest weight of the evidence supports the trial court's judgment, and we overrule the OSHP's second assignment of error.
 {¶ 30} Because our resolution of the OSHP's assignments of error results in an affirmance of the trial court's judgment, we overrule appellee's conditional cross assignment of error as moot.
 {¶ 31} For the foregoing reasons, we sustain the OSHP's first assignment of error in relevant part, we overrule the OSHP's second assignment of error, and we overrule as moot appellee's conditional cross assignment of error. Further, we affirm the judgment of the Court of Claims of Ohio.
Judgment affirmed.
PETREE and WHITESIDE, JJ., concur.
WHITESIDE, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] Tangentially, we note that this inconsistency arose when the Supreme Court relied upon case law that explained the parameters of "willful tort" — today referred to as "intentional tort" — to define "willful misconduct." See McKinney v. Hartz Restle Realtors, Inc.
(1987), 31 Ohio St.3d 244, 246, citing Denzer v. Terpstra (1934),129 Ohio St. 1, paragraph two of the syllabus. In Tighe, the Supreme Court explicitly distinguished "willful tort" from "willful misconduct," recognizing that the two concepts had "related but differentiated meanings." Tighe, supra, at 524. The court held that although "willful tort" required intent to inflict injury, "willful misconduct" did not. Id. at 527. *Page 1